Okay, our first case today is United States v. Musselman. Ms. Kostanek. Thank you, good morning, and may it please the court. This case presents a unique issue on unique facts. The jury foreperson in Dr. Musselman's trial violated the district court's explicit instructions. Immediately before deliberation, she conducted online research into the duties of a jury foreperson. And during that research, she reviewed an article recommending that deadlocked juries resolve impasse through majority or supermajority vote. Ms. Kostanek, is the problem here the fact that she conducted the online research or is the problem the document that was in the jury room? I don't think it's either of those, Your Honor. I think that it is that she conducted online research that led her to this very particular article, the LaForce article, that contained instructions that are contrary to the constitutional unanimity. So what? So, as you may know, there were two articles found. We're only challenging one of them because the other one- Wait, wait, there were no articles found. Oh, yes, Your Honor. I'm sorry. Isn't that amazing? What you're doing is like double hearsay here. There's no article in the jury room, but there was an article that she read that she used to create a document and the document said nothing that was contrary to the district court's instructions, nothing. Correct, Your Honor. And that was the document that was in the jury room. So who cares what she read? Well, I would respond to that by saying I'm not sure that it matters whether it was in the jury room or not. I mean, so take Remmer, for example, where the jury had one juror had contact- Well, I think it depends on when she went and observed that material. So if it was the night before deliberations, as she is positioning herself to be the jury foreperson, if we found out that she saw on the news in a session that instructed contrary to the district court's instructions here- That can't possibly be the test, could it? Yeah, of course it is, Your Honor. I mean, that can't possibly. You know how many trials we'd have to redo in this country if that were the test? We're throwing out harmlessness, we're throwing out anything that may have been discussed in the jury room just because one juror observed something or did something contrary to a district judge's order, you get a new trial? That's what you're asking us to do? That is not what we're asking you to do, Your Honor. So, Remmer, if you'd like to respond to that. Ms. Kastanik, let me, Ms. Kastanik, look, you are not appealing Judge Mims' decision not to inquire further of the jury person. So, even if we might think that the judge should have inquired further, it seems to me that you've waived any error in that regard. Your Honor, we have not, and let me explain why. So, Rule 606 limits what the district court can inquire about. The district court cannot ask about what happened within the black box of that jury deliberation room. And so, there is limited information. But didn't you know about the article? But subsection B2 provides that a juror may testify as to whether, and then we go to B, an outside influence was improperly brought to bear on any juror. So, had the judge brought the jury in, I think that perhaps the court could have cleared this up with a careful and focused inquiry. And to be perfectly honest, I would not have ruled out the possibility of asking each of the jurors whether the possibility of a majority verdict ever came up without asking whether anyone had advocated for such a vote or whether the jury was divided at any point. So, help me out with that. Sure, Your Honor. So, you're right. 606 allows the court to inquire with a juror as to whether they were exposed to extraneous information. So, here, that included the article that we're talking about. So, it allowed the court to ask the court... And you explicitly said, we don't need further inquiry. Well, I want to clarify, Your Honor, because I think what's missing from this is what you can't do under 606. Knowing that the jurors or the foreperson was exposed to the article only tells you half of what you need to know. Because the point is that the jury foreperson... But you told the judge you didn't want to know more. Well, I guess that that's not quite true because as this... Just the timeline of this, that's not quite right. So, the foreperson was brought in, questions were asked of that foreperson over the government's objection, who didn't want the foreperson brought in in the first place. They learned about the article, the articles. The foreperson emailed the articles to the courtroom deputy the following day saying, these are the articles I reviewed. So, that's the first time that the parties actually knew what these articles said, because that wasn't part of the questioning by the district court. And then Dr. Musselman, through trial counsel in the district court, asked for further inquiry. And the district court construed that as a motion for reconsideration and denied it. So, there was actually a request for further inquiry of the foreperson. My point here... Your Honor, it came too late. It came too late. You'd had an opportunity before that. And the foreperson's document doesn't mention the article, let alone the possibility of a majority verdict. All we know is that the foreperson read an article she shouldn't have. That mentions that possibility. I mean, boy, we'd have to jump over an awful lot of fences to get to where you wish us to be. Well, and that's why I started with, this is a really unique case on unique facts, because it is not every day. In fact, I've never been aware of this ever happening in a jury trial, where a jury foreperson goes and finds an article that is contrary to the district court's instruction on a constitutional unanimity requirement. How is it contrary to the district court's instruction, by the way? Well, the district court instructs the jury, you have to have a unanimous verdict. And the article says, I recommend that... Most people, when they read an article, they don't know what the article says before they read it. So what difference does it make if she's elected the foreperson, or she's gunning to be elected the foreperson, and she reads some article that says, how to be an effective foreperson? She doesn't know what's in the article. The article then says, unanimity is not required. Who cares? Well, I think we care. She didn't go conduct an external... She didn't scope out the scope of the place of the robbery, or go walk through the victim's home. She just read an article on how to be an effective foreperson. But that article, and I think your question makes exactly this point, is that I think it's even worse than the example of going and researching, because the article contains instructions on, what do you do if the jury breaches... But Ms. Kastanik, I don't mean to argue with you, but what you're telling us to do is just put aside and throw out the fact that the district court instructed the jury that it has to be unanimous. And what you want us to find is that, because of this article that the jury foreperson read, and never brought into the jury room, the jury disregarded the district court's instructions on unanimity. We never do that. Well, I would say that I'm not sure you've had a case in front of you to do that in before. And you know that the jury foreperson here had already disregarded the court's instructions on one issue, which is the outside research. They were repeatedly instructed not to conduct outside research. But wait, wait, wait. Outside research about what? That's the question. Certainly outside research about Medicare billing and the facts of this case, certainly. But where does the judge instruct the jury not to conduct outside research on how to be a good foreperson, or how to be an effective juror? So page 21 and 22 of the trial transcript, at the very beginning of the case, the court instructs the jury that there should not be any independent research about the matters in this case, the individuals involved in this case. You shouldn't consult dictionaries, reference materials, or search the internet. You should not try to find out any information from any source outside the confines of this courtroom. And then give- About what? About this case? Well, he didn't specify. He did. You just read it to me. About this case or the individuals involved in this case. Not about, I mean- So if I can use like a contrast to some of the other cases in which this type of issue has come up. So Warner is a great example. So there, in that case, a juror went out and did outside research about the process for substituting a juror. And that article that she found was there's no reason to believe that it was contrary to the law or contained any information that was inaccurate or conflicted with the district court's instruction. The same is true in the Estrada case, the Ace Circuit case that the government cites in their response, where the individual went out and sought information about search warrants. So that's innocuous, procedural information that is not relevant to the case. And the courts in those cases said, we're not going to presume prejudice because of how innocuous it is. The difference here is that the foreperson, the person that is in charge in that black box of the deliberations room, for determining how the jury goes forward, how it deliberates, how it breaks an impasse, is exposed to information that we know is conflicting with the constitutional unanimity requirements. So I think that this case raises just quite firmly a question of, what do you do when there is a possibility of prejudice? I take your point, Judge Kirsch, that on these facts, you think that there's not actual prejudice. But what Remmer says is when, and Remmer and so the cases like Hall v. Zink before this court, where the court said, when a court requires a likelihood of prejudice, that's actually contrary to Remmer. We look objectively at the potential for prejudice. Then you apply a presumption of prejudice. And the burden of the silent record falls on the government to rebut whether there's actual prejudice under those facts. Do you want to go on to the other issues? Yes, please. Because this wasn't solely a direct knowledge case, was it? Well, I do think that it was a direct knowledge case and that it's not all that different from Bigelow, Your Honor, where, you know, there was a choice for the jury to make between whether she had knowledge and she testified that she didn't, or whether... Rather than talk about Bigelow... I think that we should zero in right here. Couldn't one reasonably understand Ms. Musselman's practice of consulting with manufacturers, representatives, and the like when her staff raised concerns as giving her plausible deniability as to the when she got conflicting advice, shouldn't she have inquired further, not thrown the stuff into the garbage? Isn't the failure to do so deliberate avoidance? It is not, Your Honor. It is not. So the question of when is very, very important. And I think the government glosses over that question of when in its brief. So in late 2016, and I'll take simulators as an example. In late 2016, she didn't just consult with a manufacturer. She received advice from a compliance officer, Warren. She then spoke again with the manufacturer and an independent billing consultant, Cerna. She went to a conference in Vegas at which Cerna spoke to a room of doctors about this being the correct billing code. And then only after that did her staff, Brisbane and then Gibbs, raise concerns. So it's against the landscape of the work that she had already done. But weren't there at least six other employees who raised concerns about the nerve stimulator and also a fellow chiropractor? I mean, she had lots of good employees looking out for her. And the evidence seems to suggest that she ignored those employees. In fact, I think she told Warren to stay in your lane. So I'm not sure about the count of six. I know of Brisbane, Gibbs, and Lane, and Arnold. So that's four raising concerns at different times. But this is why I emphasize the timeline as being very important. Because I think part of the question is, if individuals in the office are raising concerns, is she required to credit those concerns? Or is she required to go investigate, do her own independent investigation, which she had done consulting with, as I said, independent billing consultants, a compliance officer, in addition to the manufacturers? And in that situation where it's like she's doing active investigation, we can disagree about whether that investigation was sufficient, whether she should have talked to other people. But this court's precedents say, including the Paroli case and Suzoka, which is the case involving the undercover officer, where the court said that active investigation, and this is, I believe, pretty close to a quote from the case, even if there was conflicting information that they were exposed to, is not deliberate avoidance. Like it does present that issue of, you know... That's a good argument for the jury. Yes, Your Honor. And she had that opportunity. But it doesn't mean that the ostrich instruction was inappropriate. I mean, you're taking, again, a huge leap to say she... Maybe she could have went in front of the jury. Therefore, the instruction was inappropriate. That's not the law. I do. I think that it is the law insofar as this court has recognized that giving an ostrich instruction is incorrect and reversible, not harmless error in multiple situations. First of all, it's an abuse of discretion standards. So it's a very, very difficult road. True, Your Honor. But Suzoka is a great case insofar as it involves a very similar fact pattern where there were requests for information about the legality of the conduct. And the court not only said ostrich is not appropriate in those circumstances because it is a choice between knowledge and lack of knowledge, as it is here, but it was harmful in that case because the court emphasized that the evidence of that actual knowledge, so the jury question that you're raising, is a question where the court has to be sure that the evidence was beyond a reasonable... Not just beyond a reasonable doubt. It's not the sufficiency standard. It actually is a much heightened standard where the evidence of actual knowledge needs to be... All right. I think we need to leave it there. Yeah. Okay. Thank you, Your Honor. I think we get that. All right. You're welcome. Okay. Ms. Boyle, do you have anything to add here? Good morning, Your Honors. May it please the court, counsel, my name is Catherine Boyle on behalf of the United States. The defendant, Kerry Musselman, made millions of dollars defrauding Medicare and other insurers by submitting fraudulent bills, misidentifying treatment providers and procedures performed. I'd like to focus first on the external influence issue we spent most of the time talking about so far. I think the court has correctly honed in on two things. There was a limited document that went into the jury room that made no mention of the supermajority verdict and that the defendant is the one who opposed further inquiry in the district court into the exact... In terms of how the LaForce article was or was not disseminated to other members of the jury and how much it was read. On the second point, Ms. Boyle, help me with this. Why couldn't Judge Mimoff at least ask the foreperson something like this? You know, this LaForce article mentions the possibility of resolving offense elements by a majority vote. Did the possibility of a majority vote come up in the jury room at all? So long as the court didn't ask the foreperson who said what, or was there ever a majority vote, or was there ever an impasse on any count or anything else? Why would that sort of limited inquiry not be allowed in order to get some clarity on whether the LaForce article might potentially have played a role in the jury's verdict? Your Honor, I don't think anything in the case law would have prohibited the judge from asking that question if he had wanted to. However, I think given the facts that were known and the circumstances of this case, the court acted well within his discretion in determining that there was no reasonable possibility, even on the facts that were ascertained and that he had, that this article constituted an external influence that improperly influenced the jury's verdict. So I think the court could have inquired, but I don't think it was necessary to reach that conclusion here. Tell me this, what if Mr. LaForce's article had suggested resolving impasse by a coin toss? Would there still be no need to inquire further? Well, Your Honor, I think we have to return again to the fact that the district judge here issued extremely clear jury instructions on unanimity. There's an incredibly strong presumption that the jury follows its instructions. So what we're looking at here is whether there was a suggestion of a supermajority or majority, which it's not clear was raised in front of the jury at all, or a coin toss, I think either one of those would be overcome by the very strong presumption that a juror would follow instructions in that case. And that's even more so here where there's no mention of a supermajority, majority verdict on this form. There's no indication that the jurors didn't follow the instructions they were given. And in fact, the district court, which is really in the best position to make these determinations and decide these things, has a front row seat to the trial, is observing the jurors, pulled the jurors individually and said, is this your verdict? And each juror responded yes. Yeah, he pulled, I was going to ask if the district judge pulled the jury with respect to each verdict. Yes, Your Honor, the district judge pulled the jury, said, is this your verdict? The jurors answered yes. And it's hard to believe that a juror wouldn't have said, well, this wasn't my verdict, but we did decide on a supermajority issue here. So I think there's a number of safeguards. That's just one piece. Of course, you also have the jury instructions themselves. And I want to push back a little bit too on this idea that this is a juror who was deliberately going out of bounds and trying to try to sort of insert something in the process that wasn't supposed to be there or defy an instruction. We, of course, don't necessarily want jurors going home and Googling things during trials. But this is a juror who was really actually trying to act very conscientiously, was trying to figure out, how can we do this right? How can I be a good foreperson? That also doesn't give you the impression that this is a juror who is going to say, I don't want to follow the court's instructions. I'm not going to listen to unanimity. This is not a situation where you're getting the impression that this is a juror who's engaged in some sort of defiance of the court or doesn't want to do a good job or listen to the rules. Do you want to go on to the next issue? Yes, Your Honor. So in some ways, this case strikes me as a direct knowledge case. She got lots of warnings that her billing practices were improper. Even if she characterized some of this testimony as false, she either knew or she didn't. So why was a deliberate avoidance instruction necessary? Well, this court has that it's permissible to give an ostrich instruction in situations where the evidence presented at trial could present either guilt on a theory of actual knowledge or guilt on this theory of deliberate avoidance. And frankly, I think the evidence presented at trial here could amply support either theory. I think there was a lot of evidence in the record showing that the defendant had direct knowledge of what was going on, including her supervision of billing employees, her attendance at conferences, her attendance on phone calls, warnings she had received. But I do think we have the situation here where we had a defendant who, first of all, testified herself at trial that she had no idea what was going on. So you're dealing with a denial of actual knowledge on that front. And then you also have a defendant who repeatedly reached out to biased sources, admittedly, but sources nonetheless, to say, hey, is this fraud? Can we do this in an attempt, I believe, to gain cover for the conduct? But this does present an issue of deliberate avoidance, where you have the defendant reaching out, trying to suggest that she had no knowledge of the fraudulent activity going on here. So I think given the facts of the case and these attempts to reach out to various sources who were biased, but to confirm what kind of things together really supported the need for an ostrich instruction in this case. So over the course of the scheme, the defendant had willfully ignored information regarding the illegality of her billing practices and claimed to have missed portions of meetings. She insisted her practice was using correct billing codes, even when she was confronted with contrary information. She also even said at trial, I believe, that she consulted the wrong people, but the evidence showed she deliberately took no useful steps to look into allegations of improper billing and instead consulted biased sources. She told her certified coder not to look into the issue. She never passed on information so the certified coder could check on things. She was advised by advanced medical integration not to consult the people whom she had consulted to find out whether her billing was correct, because everybody the defendant consulted, like her, was potentially going to profit from these devices being billed in this particular way. Your Honor, I did want to address one brief thing on the jury deliberation issue, if I may have a moment, just regarding the mixed verdict. The defendant mentions in their brief that they believe the mixed verdict shows that there was a reasonable possibility of prejudice, and we noted that the counts of acquittal tended to involve a case where a provider who did not testify at trial, Terry Gibbs, was listed in the billing records. There is only one count of conviction involving Ms. Gibbs, where she was listed in the billing records, where the defendant was found guilty, and in that count, Tamara Brisbane, who was the provider who was not permitted to bill Medicare but was still seeing patients at the defendant's practice testified. So we think that that explains why there was a guilty verdict on count three and potentially why there were not guilty verdicts where Ms. Gibbs did not testify on counts two, four, five, six, and seven. In all of the other counts, other than those eight, nine, ten, eleven, both the rendering provider on the chart and the provider listed in billing records testified at trial, and we believe that explains the jury's verdict. I just wanted to clarify because it seemed as though the defendant was suggesting the district court had a misimpression, and I think providing those details show that the court understood what it was saying when it talked about testimony provided. Do your honors have any further questions? Would you like me to address Remmer and the presumption? I don't see any questions. Okay, thank you. Ms. Castano, we'll give you a minute for rebuttal, if you'd like a minute. Thank you, your honor, and I'll be brief. The word that I was looking for when I sat down was conclusive, that Suzuki says that in order for a ostrich instruction to be harmless in a case that involves direct knowledge or lack of direct knowledge, and here it is far short of that for all the reasons that we've discussed, including her active investigation, and as we know from that Sozopol case as well, where the defendant is actively investigating, again, even if they're receiving conflicting information, this court has held that the ostrich instruction is inappropriate and this case fits those facts. Thank you, your honors, and we would ask that this court remand for a new trial. Okay, thank you very much. Thank you to both counsel. The case will be taken under advisement.